No. 24-4670

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

## UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

*v.*

## JOHNATHAN C. MCCASLAN,

*Defendant – Appellant.*

---

A direct criminal appeal from the United States District Court for the District of South Carolina, Spartanburg Division

District Court Docket Number: 8:23-cr-749-DCC-1

The Honorable Donald C. Coggins, Jr., presiding.

---

## OPENING BRIEF FOR APPELLANT

---

CHRISTOPHER W. ADAMS
Adams & Bischoff, LLC
171 Church Street, Suite 360
Charleston, SC 29401
Telephone: (843) 277-0090
E-mail: adams.c@me.com

MATTHEW K. WINCHESTER
Law Offices of Matthew K. Winchester
3151 Maple Drive, NE
Atlanta, Georgia 30305
Telephone: (678) 517-6894
E-mail: K.winchestercb@gmail.com

*Counsel for Appellant*
*Johnathan C. McCaslan*

---

## ORAL ARGUMENT REQUESTED

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Fed. R. App. P. 34 (a) (2) and 4th Cir. L. R. 34 (a), McCaslan's position is that oral argument would significantly aid the adjudication of the novel issue raised by issue two of this appeal.  Undersigneds submit that the legal issue presented is not frivolous and has not been recently decided by a published Fourth Circuit decision.

# **TABLE OF CONTENTS**

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.     Course of Proceedings Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

      B.     Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Argument and Citations to Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

I.     The government's evidence was insufficient to sustain McCaslan's convictions on counts three and four . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

II.    The district court erred in overruling McCaslan's authentication and chain of custody objections to Govt's. Exhibits 3A-C, 7, and 29 . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C – 1

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C – 2

## <u>TABLE OF AUTHORITIES</u>

### Supreme Court of the United States Decisions

*Jackson v. Virginia*, 443 U.S. 307 (99 S.Ct. 2781) (1979) . . . . . . . . . . . . . . . . . . . 17

### United States Court of Appeals for the Fourth Circuit Decisions

*Brown v. Nucor Corp.*, 576 F.3d 149 (4th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Banks*, 482 F.3d 733 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Brooks*, 111 F.3d 365 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Howard-Arias*, 679 F.2d 363 (4th Cir. 1982) . . . . . . . . . . 18, 21, 25

*United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Jones*, 356 F.3d 529 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . 24, 25

*United States v. Myers*, 589 F.3d 117 (4th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . 17

*United State v. Perry*, 92 F.4th 500 (4th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Ricco*, 52 F.3d 58 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Steed*, 674 F.2d 284 (4th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Summers*, 666 F.3d 192 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . 17

*United States v. Turpin*, 65 F.3d 1207 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Young*, 989 F.3d 253 (4th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . 18

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) . . . . . . . . . . . . . 17

### Extra-Circuit Decisions

*Novak v. District of Columbia*, 160 F.2d 1329 (D.C. Cir. 1947) . . . . . . . . . . . 26, 27

*United States v. Castanga*, 604 F.3d 1160 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . 20

*United States v. DeVaughn*, 694 F.3d 1141 (10th Cir. 2012) . . . . . . . . . . . . . . . . 20

*United States v. Harrington*, 923 F.2d 1371 (9th Cir. 1991) . . . . . . . . . . . . . . . . 22

*United States v. Keyser*, 704 F.3d 631 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Marzette*, 105 F.4th 1014 (7th Cir. 2024) . . . . . . . . . . . . . . . . . 21

*United States v. Mejia*, 597 F.3d 1329 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . 26, 27

*United States v. Santiago*, No. 15-cr-892, 2016 WL 954819 (S.D.N.Y. Mar. 11, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Stallings*, No. 19-11300, 2023 WL 3534445 (5th Cir. May 18, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**United States Code Provisions**

18 U.S.C. § 2261A (2) (B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18 U.S.C. § 1038 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . in passim

**Federal Rules of Criminal Procedure**

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Crim. P. 52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**Federal Rules of Evidence**

Fed. R. Evid. 901 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22, 25

## <u>JURSIDICTIONAL STATEMENT</u>

(A)   The United States District Court for the District of South Carolina had subject matter jurisdiction over this criminal action pursuant to 18 U.S.C. § 3231.

(B)   The United States Court of Appeals for the Fourth Circuit has jurisdiction over this appeal from a final judgment of the district court under 28 U.S.C. § 1291.

(C)   McCaslan's notice of appeal, while not jurisdictional, was timely filed on December 16, 2024, JA075, within fourteen days of entry of the judgment and commitment.  JA070.  Fed. R. App. P. 4 (b) (1) (A) (i).

## <u>STATEMENT OF THE ISSUES</u>

I.    Was the government's evidence at trial sufficient to sustain McCaslan's convictions for counts three and four, alleging a violation of 18 U.S.C. § 1038 (a)?

II.    Before trial, the officer who first secured the letter, envelope, and stamps at issue passed away. With this officer unavailable, the government admitted these items through SLED agents who later found them on the deceased officer's desk in an unmarked evidence bag. No chain of custody form accompanied this bag, and the SLED custody record for one of the DNA samples revealed potential contamination. Did the district court err in overruling McCaslan's chain of custody and authentication objections?

2

## STATEMENT OF THE CASE

The ultimate issue at trial was who authored the anonymous letters. This appeal highlights significant questions concerning the standard for authentication and chain of custody of physical evidence. Because the letter, envelope, and stamps at issue were not proven to be "substantially similar" to their original condition, and there was a proven risk that a DNA sample taken from those items were contaminated during the forensic process, the district court committed reversible error in admitting this evidence. McCaslan is entitled to a new trial.

### A.    Course of Proceedings Below.

On November 9, 2021, around 12:15pm, the mailman arrived at 318 Rice Street, Calhoun Falls, South Carolina 29628 and delivered a yellow envelope.[1] This envelope bore only "318 Rice Street," was affixed with outdated 41-cent stamps that were "X"d out, and did not show a return address. JA235, 238; *see* JA248 (A: "its not addressed to nobody. It's just the address.").

Tamara Lee lived at 318 Rice Street with her then boyfriend, Jordan Smith. JA236. Smith worked as a full-time officer with the Calhoun Falls Police Department.[2] JA256. Shortly after noon, Smith woke up from a night shift and was

---

[1]  The mailman saw an empty chip bag and a Pepsi can in the mailbox. The chips and Pepsi can were not in the mailbox the day before. She did not know who sent the letter.

[2]  Smith testified that Calhoun Falls is a very small town with only three full-time police officers in their department. *Id.*

about to eat lunch when Lee entered the house in a panic. JA258. Lee had opened the yellow envelope to find a folded paper that contained a powder substance. Lee dumped the powder on the porch, read the letter, and interpreted it as a threat to her and Smith. JA235.

This letter read:

> YOU THINK YOU CAN PRESS CHARGES AGAINST ME. I'VE ALREADY BEAT YOU AT YOUR ON GAME. I GOT CONNECTION TO. YOU CAN NOT TOUCH ME. I KNOW HOW DIRTY YOU ARE. YOU AN THAT DOG YOU LIVE WITH CAN KISS MY ASS. IF I SEE HER WHEN I WORK WITH HER AGAIN I WILL BEAT HER ASS. YOU WILL GET WHATS COMING TO YOU. YOU CAN NOT HIDE BEHIND THAT BADGE.

Smith was inside the house. Smith came outside after Lee dusted the powder onto the porch. JA246. Lee threw the powder on the porch, came inside to read the letter and realized there was more powder; she then laid it on the porch. JA246. Smith suspected fentanyl and called the Chief of Police.

The Chief told Smith to call his partner, Treaco Hoover,[3] and the Abbeville County Sherriff. Abbeville responders, Hoover, and Smith field tested the powder, which tentatively showed fentanyl, but SLED chemical analysis later determined the powder was a harmless peanut oil mixture. JA333.

---

[3] Hoover passed away from a heart attack and did not testify at trial. JA271.

When SLED arrived at Rice Street, there was no powder remnant on the porch.[4]  JA330.  The powder sample that was tested was taken from the folds of the envelope and letter.  JA337.  The envelope and letter were placed into an evidence bag, but this bag was never marked, and no property form was created to accompany the bag.  JA339-42.  Hoover transported the unmarked bag and its contents to the Calhoun Falls Police Department.  Hoover's transport of this evidence was neither documented nor recorded.  CFPD at this time did not require officers to wear a body camera.

A post office employee testified that the Rice Street letter travelled from its origin, through the Greenville mail center, to the Calhoun Falls post office where it was sorted for delivery.  JA306-07.  Numerous employees touched this letter during this process.

Neither Smith nor Lee knew who wrote the letter, but first suspected that the author was Kim McCaslan.  JA239, 260.  In Smith's words: "[Kim] was the only person that was linked between me and Tamara Lee."  JA260.  Lee and Kim worked together as certified nursing assistants for a local nursing home—two months before the letter arrived, Lee and Kim had a "spat" at work.  JA233, 240.  These ladies argued over the hierarchy of authority.

---

[4]  SLED located nothing else of value when officers searched the house.  JA340.

According to Lee, Kim made negative comments about her then-husband, Chris McCaslan, on work cigarette breaks. Lee relayed Kim's remarks to Chris when they saw each other on Rice Street, but she did not tell Chris about her work argument until one month after she told Chris she worked with Kim. Lee told a SLED agent that she first told Chris she worked with Kim three months after she moved to Rice Street, in September. This statement placed Chris's knowledge *after* Lee received the November 9 letter.

When Lee and Smith moved to Rice Street, Chris brought them a Boston butt as a housewarming gift. JA252. Smith knew Chris from their work with the fire department and as a member of the community. JA257.

The day prior to receiving the letter, Smith conversed with Chris at the local 7-11 gas station. JA263. There, Chris advised Smith that he and Kim had divorced and what Kim's visitation schedule was. Chris told Smith that Kim and her son were video recording Smith's home, and that Kim might have recently been stopped with illegal pills. Kim had previously been stopped by Smith at the Savannah Grill for driving without a license. JA265.

Smith did not take warrants against Kim at the time because, according to Smith, Kim's case was low priority and the Calhoun Falls office was understaffed. But Smith told Chris he would take warrants on Kim. JA265-68. Hoover also sought

warrants on Kim for stealing Chris's generator from their marital residence, but a magistrate judge dismissed these warrants as a "family court issue."

On November 10, 2021, after being placed on lookout for suspicious mail, a postal worker identified an odd envelope addressed to the Calhoun Falls Police Department without a return address. JA312-13. This worker notified the postmaster and placed the envelope in a hazmat tub. SLED discovered this letter contained a "small amount of darker gray material" that tested for "milk based infant formula, water and mineral seed oil." JA326. This letter read:

> PERRY, I KNOW HOW DIRTY YOU ARE. YOU TRIED TO GET ME LOCKED UP. YOU TRIED TO GET MY KID IN TROUBLE. YOU WILL PAY FOR WHAT YOU DONE. I THOUGHT YOU WERE BETTER THAN THAT. I'VE DONE FAVORS FOR YOU AND YOUR FELLOW OFFICERS AND GET TREATED LIKE THIS. I WILL START TALKING IF I GO TO JAIL. TELL YOUR ASSISTANT CHIEF TO PAY ATTENTION. JA359.

In November 2021, Hoover was the CFPD assistant chief. JA360. Hill believed that this letter referred to his investigation of Chris's stolen generator. During the generator investigation, Kim got an attitude with Hill and tried to stop Hill from interviewing her son, Durant. Kim accused Hill of harassing Durant. JA363-64.

The SLED bomb squad was called due to the suspicious powder. SA Slizewski arrived to find an unmarked evidence bag unattended and cut open on

Hoover's desk: "we placed that evidence bag into a SLED evidence bag, collecting it and sealing it to be submitted to the lab the next day." JA417.

Amidst commotion at the police department, other agents cut open the evidence bag "to get to the material," tested it, and then placed the items back in the bag. JA325-27. At trial, SA Foster "believed" that Govt.'s Ex. 7 was the bag he cut open, but could not say for sure, and SA Drake said this bag was already cut when he took possession for transport to the lab. JA406. SA Drake wrote "unsealed" on the chain of custody form. *Id.* When Agent Kirk arrived, SA Drake was outside and had no line of sight to this evidence bag containing the November 10 letter. JA404-06. SA Drake could not recall whether the items were ordered in the bag the same way they were when he first saw the bag at the police department.

On November 21, 2021, an investigator with the state Board of Licensing and Labor Regulation emailed Aparamedic01@hotmail.com to reach Kim for a statement. The board requested a statement to explain a February drug arrest that Kim had purportedly disclosed via letter, bearing her initials, received October 27, 2021. This October 27 letter admitted to drug use, alcohol, and stealing from the nursing homes where she worked. JA378. Kim denied writing this letter or initialing it—she testified the handwriting resembled Chris. JA446.

Aparamedic01@hotmail.com was registered to Johnathan C. McCaslan. JA389. Though Kim denied using Aparamedic01@hotmail.com, JA445, this

8

address appeared on her 2020 application to renew her nursing license. JA452. Kim denied that she ever received the Nursing Board's letter, dated October 21, which requested a statement on her February drug arrest.

Kim denied mailing the November 9 and 10 letters or the powder substance. JA424. Kim claimed that, until SLED interviewed her, she was not aware that Smith had pressed charges against her for driving unlicensed. Kim knew Smith was Lee's boyfriend at the time, but believed her relationship with Lee was good. JA430-33.

But Kim was significantly impeached. Kim admitted to selling Chris's generator against her divorce decree due to financial problems, but claimed that she was not aware the generator issue was presented to a magistrate. JA435. On cross-examination, Kim conceded her numerous lies to the South Carolina trooper that arrested her for pills; to the South Carolina family judge; to her children's guardian ad litem; causing the divorce through adultery; and evading SLED's request for a DNA sample. As trial counsel argued: "Kim McCaslan was a train wreck" who "lied to everyone."

Kim hit "rock bottom" in February of 2021 when she was arrested for illegal possession of prescription pills. According to Kim, she lost her kids because she was an alcoholic and had problems with marijuana. Kim lost everything and had to start over. Ultimately, Kim's drug case was diverted and she received a private reprimand from the nursing board. JA444. Kim's arrest caused a family court judge

to award permanent custody of their children to Chris in an emergency hearing. JA440.

Evidence as to who authored the indicted letters was in equipoise. A handwriting expert testified that, after reviewing both Kim and Chris's writing samples, he was unable to determine whether Chris or Kim wrote the Rice Street and Calhoun Falls letters. JA492. Chris provided the most handwriting standards for analysis. The expert opined it was highly likely that Chris wrote the PO Box information depicted at the bottom of the October 21 letter to the nursing board. But, this expert could not determine if any of the four individuals who gave handwriting samples initialed "KM" on the October 21 letter. JA491, 493.

Forensic serologists excised samples of the Rice Street envelope and stamps to submit for DNA comparison. A forensic scientist testified that a DNA sample was obtained from a stamp on the November 9 envelope,[5] but that it was possible that the DNA results from the sample obtained from the envelope flap were contaminated. JA522. The stamp sample was taken from the same envelope and testimony showed there were multiple ways for human DNA to be easily transferred. Despite contamination on the envelope flap, the scientist opined that Chris's profile contributed to the stamp sample; that Smith and Hoover did not contribute; and that

---

[5] To get the sample, the scientist cut a portion of the stamp, placed it into a vial, and sealed the vials in a bag. This bag was then initialed and dated before being sent for DNA analysis.

Kim had a very low contributing profile to the stamp.  JA552-55.  Chris was excluded from the flap sample.

SLED Special Agent Adam Slizewski interviewed Chris.  Chris denied sending the letters and voluntarily gave his fingerprints and DNA for examination.  JA601.  Chris knew that Calhoun Falls had sought warrants over the stolen generator, that Hoover was the assistant chief, and he admitted to telling Smith that Kim's driver's license was suspended.  JA586-87.

SA Slizewski agreed that, in a November 1, 2022 interview, Lee told him that the first time she told Chris that she worked with Kim was *three months after* they moved to Rice Street.  JA603.  Lee and Smith moved to Rice Street on September 1: Lee's statement that Chris was not told until three months later (December) meant that Chris could *not* have known Kim and Lee worked together before the anonymous letters were received (November).  JA604.  Timing was significant because the November 9 letter referenced Kim's work dispute with Lee.

## B.    Procedural Background.

On September 13, 2023, a federal grand jury in the District of South Carolina returned an indictment charging McCaslan with one count of harassing communications (18 U.S.C. § 2261A (2) (B)) and one count of delivering through the mail a threat to inflict bodily injury upon "TL."  (18 U.S.C. § 876 (c)).  This indictment was twice superseded, JA018, and the Second Superseding alleged four

counts, incorporating the prior two counts and adding two alleged violations of 18 U.S.C. § 1038 (a) (1).  JA019-20.  McCaslan denied the allegations, entered not guilty pleas, and demanded a jury trial.

Prior to trial, McCaslan moved *in limine* to "introduce evidence of poor investigative techniques," "introduce evidence of specific instances of conduct," and "introduce statements of members of prosecution team."  JA021, 028, 035.  Relevant to the authentication issues in this appeal, these motions sought to introduce evidence from the Calhoun Falls Police Department that mistakes were made during the early phase of this investigation, that a CFPD officer who should not have participated did, in fact, participate, and that a government witness had witnessed Hoover improperly write tickets for an opposition Calhoun Falls Mayoral candidate. JA026-27, 031-33, 039.

According to the motion, the current Chief of the CFPD told the government that "record keeping . . . was in disarray when he took over from the prior administration."  JA024.  The Chief stated that:

- He could not locate personnel files of officers upon assuming office;

- The evidence stored at CFPD was not accompanied by "log-in sheets"; and

- He had to inventory all the stored evidence at CFPD and move it to a different, secure room.  JA024.

In limine, the district court gave advisory rulings that Hoover's misconduct with the Mayoral candidate was not relevant, but that McCaslan could cross-examine concerning Hoover's mishandling of evidence and confusion at the CFPD.

During the trial, McCaslan raised several chain of custody objections to government exhibits 3C, 7, 15, 27 and 29. JA200, 205, 349, 375, 393-98, 506, 540-41, 548-49. The question was whether the government – without Hoover – could link the bag that Hoover left Rice Street with to the evidence bag manipulated by Agent Foster and transported to the lab by Agent Drake. Beyond the DNA link to the potentially contaminated stamp sample, there was no direct evidence linking McCaslan to *any* letter.

At trial, the government called fourteen witnesses to support its prosecution theory that McCaslan authored the anonymous letters to "puppet" the Calhoun Falls Police Department against his ex-wife. McCaslan's defense was that Kim wrote the letters. Chris argued he did not need a "knockout punch" against Kim—there was no motive or need to effect the scheme because Chris had prevailed in the divorce proceedings and obtained custody over their shared children.

During its deliberations, the jury's sole question asked to review the DNA probability chart—a demonstrative introduced during the testimony of forensic scientist Leisy. JA763. After one day of deliberation, McCaslan was convicted on counts one through four. JA055-56.

13

Fourteen days after conviction, McCaslan moved for a new trial notwithstanding the verdict. JA057 (invoking Fed. R. Crim. P. 33 (a)). In his motion, McCaslan argued insufficient evidence on three separate grounds:

(1)   As to count one, that the government failed to prove the "course of conduct" element of Section 2261A (2) (B);

(2)   As to count two, that the absence of an individual addressee on the envelope, or salutation within the letter, failed to prove that the November 9 letter threatened bodily injury to a specific person; and

(3)   As to counts three and four, that neither the November 9 nor 10 letters indicated that a violation of 18 U.S.C. Chapters 10, 11B, and 113B was taking place or would take place. *See* JA060-64.

The district court denied the motion for new trial. JA079. In its order, the Court rejected McCaslan's sufficiency challenge to count one because McCaslan's DNA was linked to a stamp on the November 9 letter, and the DNA evidence, viewed together with testimony concerning McCaslan's efforts to coordinate CFPD officers against Kimberly, established a course of conduct. JA083-85. The order found that *United States v. Rendelman*, 641 F.3d 36, 44 (4th Cir. 2011) foreclosed McCalsan's challenge to count two, and that, although the content of the letters charged in counts three and four did not specifically reference the powder they contained, the powder's

inclusion in threatening letters was sufficient to convey "the specific presence of a weapon, in the form of an agent, toxin, or chemical, in the letters."  JA085-89.

A United States Probation Officer prepared a presentence investigation report that recommended a total offense level 18.  McCaslan objected and moved for a downward variance.  After a contested sentencing, the district court granted McCaslan's motion for downward variance and imposed a concurrent sentence of five years' probation with special conditions.  JA092.

On December 16, 2024, McCaslan, through appellate counsel, filed a timely notice of appeal to the U.S. Court of Appeals for the Fourth Circuit.  JA096.  This briefing follows.

## SUMMARY OF THE ARGUMENT

The government failed to prove counts three and four because, assuming McCaslan authored the November 9 and 10 letters, there was no nexus between the alleged false information and a violation of the chemical weapons statutes.

The district court erred in overruling McCaslan's authentication and chain of custody objections to Government's Exhibits 3A-C, 7 and 29. Without Hoover, there were at least two material breaks in the chain: (1) transport from the scene to the CFPD; and (2) CFPD to the SLED forensic lab. Although SLED agents had knowledge of their testing activity, they did not know whether the bag they cut at the police department was the bag used to first secure the first letter. The evidence bag was unmarked and no chain form accompanied the evidence or the bag.

The material breaks in chain of custody, examined together with the other negligence in this investigation, create an abuse of discretion. Unlike prior Circuit precedent, these chain breaks were material because the government failed to prove that the DNA samples taken from the envelope and stamps were in a substantially similar condition as when they arrived at Rice Street. Substantial similarity was not proven because the SLED custody forms noted potential contamination of the envelope sample when the samples were taken for DNA analysis. Admission of this evidence was harmful error because the DNA sample obtained from the 41-cent stamp was the sole direct evidence linking McCaslan to *any* indicted letter.

## STANDARD OF REVIEW

### I.     Insufficient evidence of counts three and four.

McCaslan preserved this issue by moving for a directed verdict via Fed. R. Crim. P. 29. *United States v. Steed*, 674 F.2d 284, 286 (4th Cir. 1982). The standard of review of a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (99 S.Ct. 2781) (1979).

### II.     Error in overruling authentication objections to government exhibits.

"We review for abuse of discretion a trial court's decision concerning the admissibility of evidence." *United States v. Summers*, 666 F.3d 192, 197 (4th Cir. 2011) (citing *United States v. Myers*, 589 F.3d 117, 123 (4th Cir. 2009)). "A court has abused its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *Brown v. Nucor Corp.*, 576 F.3d 149, 161 (4th Cir.2009) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir.1999))

## ARGUMENT AND CITATIONS TO AUTHORITY

**I.    The government's evidence was insufficient to sustain McCaslan's convictions on counts three and four.**

Counts three and four of the Second Superseding Indictment alleged two violations of 18 U.S.C. § 1038 (a).  JA019-020.  Section 1038 (a) prohibits:

> Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B of this title[.]

Although this Circuit has yet to construe Section 1038 (a), at least one district court opinion (cited by the order below) has held that Section 1038 (a) "focuses on the defendant's *conduct*."  *United States v. Santiago*, No. 15-cr-892, 2016 WL 954819, at *2 (S.D.N.Y. Mar. 11, 2016).[6]  But here, however, the government did not indict Section 1038 (a)'s "conduct" element.  JA019-020; *see generally United States v. Young*, 989 F.3d 253, 263 (4th Cir. 2021) ("When the government presents evidence that broadens the bases for conviction beyond those charged in the indictment, a variance occurs.").

The Second Superseding indictment alleged that McCaslan *in fact* conveyed false and misleading information; counts three and four's particulars alleged that the

---

[6]  The relevant division of the *Santiago* order cited no authority to support its analysis.

false and misleading information was intentionally conveyed by McCaslan authoring two letters that contained specific threats and a powdery substance:

### COUNT 3

On or about November 8, 2021, in the District of South Carolina and elsewhere, the defendant, JOHNATHAN C. MCCASLAN, did intentionally convey false and misleading information, to wit: by authoring a letter containing a threat that the recipient "WILL GET WHATS COMING TO YOU" which was placed in an envelope along with a powdery substance and subsequently mailed to 318 Rice St., Calhoun Falls, South Carolina, under circumstances where such information may reasonable have been believed, that indicated that an activity was taking place, to wit: the unlawful transfer of an agent, toxin or chemical, that would constitute a violation of 18 U.S.C. Chapters 10, 11B, and 113B.

### COUNT 4

On or about November 9, 2021, in the District of South Carolina and elsewhere, the defendant, JOHNATHAN C. MCCASLAN, did intentionally convey false and misleading information to wit: by authoring a letter containing a threat to make the recipient "PAY FOR WHAT YOU DONE" which was placed in an envelope along with a powdery substance and subsequently mailed to P.O. Box 246, Calhoun Falls, South Carolina, under circumstances where such information may reasonably have been believed, that indicated that an activity was taking place, to wit: the unlawful transfer of an agent, toxin, or chemical that would constitute a violation of 18 U.S.C. Chapters 10, 11B and 1113B.

As alleged, the evidence was insufficient to sustain counts three and four because the government's evidence did not prove that the false information McCaslan conveyed (i.e., the threats in each letter) indicated that a violation of the chemical weapons statute was taking place. The letter content alleged to be false or

19

misleading was the threats, but these threats did not expressly indicate that a violation of the chemical weapons statute was taking place, nor did the threats reference the powder or the effects that exposure to the powder would have on the letter recipients.  A reader of both letters would not deduce that any powder or substance accompanied the letters, or that any powder substance would be used by the author to execute the threats.

McCaslan's facts are distinguishable from other Circuit opinions affirming Section 1038 (a) convictions because these cases involved direct or indirect references to notorious harmful substances to be used as weapons, or actual weapons.  *See United States v. DeVaughn*, 694 F.3d 1141 (10th Cir. 2012) (defendant mailed letters to Congress members and the President referencing anthrax); *see also United States v. Keyser*, 704 F.3d 631 (9th Cir. 2012) (defendant mailed sugar packets labeled "anthrax" with a biohazard symbol); *see also United States v. Castagana*, 604 F.3d 1160 (9th Cir. 2010) (defendant admitted that powder in threatening letter was "symbolic" of anthrax and made present threats within the letter linked to chemical weapon).  To be sure, the district court erred in its reliance on *United States v. Stallings*, No. 19-11300, 2023 WL 3534445, at *3 (5th Cir. May 18, 2023) because the defendant in *Stallings* expressly told a bus driver that the bags he left at the bank contained a bomb.

As McCaslan argued below in his Fed. R. Crim. P. 29 and 33 (a) motions, Section 1038 (a) required the alleged false or misleading information to indicate a present, past, or future violation of the chemical weapons statutes. The specific language employed by count three and four was present tense: "was taking place." But the November 9 and 10 letters contained threats of *future* harm. Because the required nexus was not proven, counts three and four must be reversed.

## II. The district court erred in overruling McCaslan's authentication and chain of custody objections to Govt.'s exhibits 3A-C, 7, and 29.

"The chain of custody rule is but a variation of the principle that real evidence must be authenticated prior to its admission into evidence." *United States v. Howard-Arias*, 679 F.2d 363, 366 (4th Cir. 1982) (citing Fed. R. Evid. 901 (a)). "Chain of custody focuses on the sequence and integrity of the movement of evidence, from the time of its recovery to its presentation in court." *United States v. Marzette*, 105 F.4th 1014, 1018 (7th Cir. 2024).

"The purpose of this threshold requirement is to establish that the item to be introduced [] is what it purports to be." *Id.* Although not an "iron-clad requirement," the chain's purpose is to ensure that "the authentication testimony was sufficiently complete so as to convince the court that it is improbable that the original item had been exchanged with another or otherwise tampered with." *United States v. Perry*, 92 F.4th 500, 515 (4th Cir. 2024) (quoting *Howard-Arias*, 679 F.2d at 366).

For Fed. R. Evid. 901 (a), the dispositive questions are whether (1) the prosecution proved that the items introduced (i.e., exhibits 3A-C, 7 and 29), were what they purported to be (i.e., the DNA sample taken from a 41cent stamp on the November 9 Rice Street letter, the evidence bag this letter was placed in, and vials containing the same DNA present on the letter samples); and (2) that these items were in "substantially the same condition as when they were seized." *United States v. Turpin*, 65 F.3d 1207, 1213 (4th Cir. 1995) (citing *United States v. Harrington*, 923 F.2d 1371 (9th Cir. 1991)).

The government failed to do so. On the unique facts of this case, the Rice Street sample exhibits were not authenticated, and there was a proven risk that the DNA samples (including the sample used to link McCaslan to the Rice Street letter) were inadvertently contaminated during the forensic analysis. A proven risk of contamination precludes a finding that this evidence was in a "substantially similar condition" as it was when initially secured.

For government's exhibit 3A-C (Rice Street letter, envelope, and DNA sample from the stamp), Smith and Hoover were the first in contact with the letter and envelope after Lee dropped these items on the porch. After the field test, Smith did not take possession, Hoover did. Hoover did not wear a body camera—transport from Rice Street to the Calhoun Falls Police Department was not recorded or otherwise documented. Hoover died prior to trial. Smith conceded mistakes, did

not mark the evidence bag that was first used to secure the items, and told SLED agents that he did not do the best job of preserving the powder.

The first missing link in the chain was that, absent Hoover, there was no explanation of how the Rice Street letter was transported from Rice Street to the Calhoun Falls Police Department.  Because Smith did not accompany when Abbeville and Hoover left Rice Street, Smith could not, and did not, testify as to how the evidentiary items were transported.  Smith had no knowledge of whether the items seized from Rice Street were tampered with or contaminated.  No SLED witness identified the cut evidence bag on Hoover's desk as containing the same letter that Lee pulled from her mailbox.  Lee never saw the evidence bag.

The second break in the chain was the absence of testimony that the cut evidence bag (and items contained therein) found on Hoover's desk was the same bag used to collect the items at 318 Rice Street.  Because Smith and Hoover did not initial or date the bag, there was no direct evidence that the bag cut by SLED was the bag used to collect the items on scene.

The SLED agents who cut the evidence bag to test the powder were not present when the items were first placed in the bag.  Neither SA Foster nor SA Drake knew whether the letter items were contaminated before the bag was cut open for testing and then transferred to SA Slizewski.  SA Drake noted significant traffic inside the police department, and there was a notation "unsealed."  SA Drake had no

23

line of sight to the bag and could not recall if the items were turned and positioned the same way that they appeared inside the bag at trial.

To show a risk that the DNA samples were contaminated, McCaslan cross-examined the forensic serologist on SLED custody records for the samples. This chain of custody record showed that a staff member (forensic scientist Catherine Leisy) "may have contributed" to the sample taken from the Rice Street envelope flap when she took custody of that sample from May 18 until August 18, 2022. JA519-521. This potentially contaminated sample was taken from the same envelope as the stamp sample was. JA517. The stamp sample was used to directly link McCaslan to the Rice Street letter.

The serologist conceded that protocol required gloves and other precautions because there were multiple ways to transfer human DNA. According to the serologist, if one sample may have been contaminated, it was possible that the other samples were contaminated, including the sample the government used to directly link McCaslan to a stamp on the Rice Street letter. JA521-22. Though this Court has held that "a missing link in the chain of custody does not prevent the admission of real evidence," that follows only where "the evidence is what it purports to be *and has not been altered in any material respect*." *United States v. Jones*, 356 F.3d 529, 536 (4th Cir. 2004) (emphasis added). This second clause of the relevant *Jones* language was not satisfied in McCaslan's case.

24

The proven risk of contamination distinguishes McCaslan's "break in the chain" from prior precedent. For example, in *Howard-Arias*, the district court did not abuse its discretion in admitting marijuana seized by the Coast Guard, despite absence of testimony from DEA Agent who received marijuana for transit to DEA, because agents from each step in the chain testified. 679 F.3d at 365-67. This Court in *United States v. Ricco*, 52 F.3d 58, 62 (4th Cir. 1995) similarly upheld admission of seized cocaine because, despite a break from the county evidence locker to the DEA lab, the cocaine that was tested remained in a sealed bag that was both marked and initialed. *Id.*; *see also Jones*, 356 F.3d at 536-38 (no abuse of discretion where government failed to produce testimony of courier for secure drugs from police department to DEA lab). Significantly, these prior cases did not involve DNA (an inherently sensitive, and probative, form of modern evidence), nor multiple breaks in the chain with a proven risk of sample contamination.

Specific, material factors that caused affirmance in prior Circuit cases applying Fed. R. Evid. 901 (a) are *not* present here:

(1)    continuous, marked seal of an initialed evidence bag and/or written chain of custody forms accompanying the evidence;

(2)    potential contamination of fungible DNA samples; *and*

(3)    chain breached in the initial seizure.

These distinctions invoke the exceptions to the general rule that a break in the chain does not undermine admissibility: here, the stamp samples and the evidence

25

bag were *not* proven to be what they purported. With a proven risk of sample contamination, the government failed to prove that the DNA isolated by the serologist and analyzed by the chemist Leisy was "substantially the same" as that present on the Rice Street envelope when it arrived on November 9.

Other Circuits acknowledge that "[a] break in the chain of custody [] can be serious enough that the district court may abuse its discretion in admitting the evidence." *United States v. Mejia*, 597 F.3d 1329, 1336 (D.C. Cir. 2010) (citing *Novak v. District of Columbia*, 160 F.2d 588, 588-89 (D.C. Cir. 1947)).[7] In *Mejia*, the DC Circuit found harmless error in the erroneous admission of a DEA letter that did not bear the defendant's signature, was not linked to the defendant, and was given to an agent not present for the defendant's arrest. This letter was given to a DEA agent by non-testifying Salvadorian police officers, and the government conceded there was no way to prove the Salvadorian's preservation of his wallet. Because there was evidence corroborating that the list was Mejia's, and the mere 10-minute gap in the chain made tampering implausible, the Circuit found any error was harmless.

---

[7] In *Novak*, the DC Circuit reversed a conviction for the government's failure to authenticate a urine sample. There, the arresting officer who took the sample testified to what he did, how he marked the sample, and to whom he turned it over. Chemists testified to their analysis but no effort was made to ask the arresting officer whether the sample analyzed by the chemists was the same sample he took from the defendant. 160 F.2d at 589.

*Mejia* discussed *Novak* and held that, while Rule 901 (a) does not require perfection in the chain as a prerequisite to admissibility, a break in the chain can be serious enough to preclude admission and otherwise cause an abuse of discretion. Although the error in *Mejia* was harmless, the material factors that *Mejia* relied on (tampering and contamination implausible) are not present in McCaslan's case. Also distinguishable from *Mejia*, the initial break in the chain between the time the first letter was received at Rice Street until SLED manipulated the evidence bag at the police department, far exceeds 10 minutes. The district court erred.

Under Circuit precedent, "[e]videntiary rulings are subject to harmless error review under Federal Rule of Criminal Procedure 52, such that [] to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (quoting *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir.1997)). In criminal cases, harmless error may occur where "there is a significant amount of evidence which inculpates a defendant independent of the erroneous testimony." *Id.*, at 295 (citing *United States v. Banks*, 482 F.3d 733, 741–42 (4th Cir.2007)).

Once error is found, the burden to show harmlessness rests with the government. Here, like in *Johnson*, the government cannot show harmlessness

27

because the DNA sample from the 41cent stamp (Govt's Ex. 3C & 29) was the sole direct evidence linking McCaslan to the letters indicted in counts three of four. By the jury's written question, it is apparent that the DNA analysis results were central to the deliberations, and the prosecutor's closing argument used McCaslan's DNA on the stamp as central to its prosecution theory. JA677-680, 686, 720.

Outside of the DNA, there was not a significant amount of evidence implicating McCaslan. McCaslan was not linked to the November 10 letter. McCaslan had no motive to threaten Hill. Though Kim denied sending either letter, Kim's DNA profile was located on the same DNA stamp sample that Chris's was, and Kim admitted to being evasive in response to SLED's request for her DNA.

Kim's motive to threaten Hill was proven through Hill's testimony about Kim's conduct during his investigation of her conceded generator theft, i.e., Kim got an attitude with Hill and accused Hill of threatening her son. Kim's motive to threaten Lee and Smith was similarly proven through her prior arrests in Calhoun Falls and her work "spat" with Lee over their employment hierarchy. Chris, on the other hand, brought Lee and Smith a housewarming gift, and Lee's initial statement to SA Slizewski supported that Chris never learned that Lee worked with Kim until December—after both threatening letters were sent and received.

Though the government argued that Chris was motivated against CFPD by their failure to secure warrants for Kim, evidence overwhelmingly showed that Chris

did not need a "knockout punch" in the divorce conflict. Kim, through her own flaws, was arrested on drug charges, lost custody of her children, and was in financial dire straits. Generally speaking, Kim was significantly impeached by her lies to almost every authority figure involved in the case: the jury knew that Kim had lied to state judges, patrol officers, the nursing board, and SLED investigators.

Accordingly, because the district court abused its discretion in admitting the only direct evidence linking McCaslan to the offenses, and the remaining evidence is not overwhelming, this error is reversible. A new trial is therefore required.

**(Continued on the next page with signatures)**

## **<u>CONCLUSION</u>**

For the foregoing reasons, Johnathan Christopher McCaslan respectfully requests this Court to **REVERSE** his convictions, and **REMAND** his case to the United States District Court for the District of South Carolina, Anderson Division, with instructions that a **NEW TRIAL** be granted.

Respectfully submitted this 18th day of March, 2025.

<u>*s/ Christopher W. Adams*</u>
Christopher W. Adams
Adams & Bischoff, LLC
171 Church Street
Suite 360
Charleston, SC 29401
Tel: (843) 277-0090


<u>*s/ Matthew K. Winchester*</u>
Matthew K. Winchester
Law Offices of Matthew K. Winchester, LLC
3151 Maple Drive, NE
Atlanta, Georgia 30305
Tel: (678) 517-6894

*Appellate counsel for*
*Johnathan C. McCaslan*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this document complies with the typeface requirements of Fed. R. App. P. 32 (a) (5), and the type-style requirements of Fed. R. App. P. 32 (a) (6), because it has been prepared in 14-point Times New Roman, a proportionally spaced typeface, using Microsoft Word 2020 word processing software.

This brief complies with the type-volume limit of Fed. R. App. P. 32 (a) (7) (B) (i) because, excluding the parts of the document exempted by Fed. R. App. P. 32 (f) and 4th Cir. L. R. 27 (d) (2), this document contains less than 13,000 words.

This 18th day of March, 2025.

*/s/ Christopher W. Adams*
Christopher W. Adams
SC Bar No. 66142

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to 4th Cir. L. R. 25 (a) and Fed. R. App. P. 25 (d), I have this day served a copy of the foregoing Opening Brief electronically using the Fourth Circuit's CM/ECF system that will automatically send e-mail notification of such filing to all parties of record.

This 18th day of March, 2025.

AUSA William Jacob Watkins, Jr.
One Liberty Square
55 Beattie Place, Suite 700
Greenville, South Carolina 29601

This 18th day of March, 2025.

<u>/s/ Christopher W. Adams</u>
Christopher W. Adams
SC Bar No. 66142